Askari v McDermott, Will & Emery, LLP (2019 NY Slip Op 08547)





Askari v McDermott, Will & Emery, LLP


2019 NY Slip Op 08547


Decided on November 27, 2019


Appellate Division, Second Department


Austin, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on November 27, 2019
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

ALAN D. SCHEINKMAN, P.J.
RUTH C. BALKIN
LEONARD B. AUSTIN
SYLVIA O. HINDS-RADIX, JJ.


2016-04472
 (Index No. 606862/15)

[*1]Kevin Askari, et al., appellants, 
v
McDermott, Will & Emery, LLP, et al., respondents.



APPEAL by the plaintiffs, in an action for replevin, from an order of the Supreme Court (Timothy S. Driscoll, J.), entered in Nassau County on May 3, 2016. The order denied the plaintiffs' motion for summary judgment on the complaint and granted the defendants' separate cross motions for summary judgment dismissing the complaint insofar as asserted against each of them.



James Sawyer, Jericho, NY, for appellants.
McDermott, Will & Emery, LLP, New York, NY (James A. Pardo and Allison E. Fleischer of counsel), respondent pro se.
Holland & Knight, LLP, New York, NY (Christopher G. Kelly and Katherine A. Skeele of counsel), for respondent Oncomed Specialty, LLC.



AUSTIN, J.


OPINION & ORDER
On this appeal we are asked to address a conflict between New York and Delaware law relating to which law applies, and implicating who or which entity may assert the attorney-client privilege, in the context of the merger and restructuring of businesses, the sale of membership interests, and related transactions which occurred in connection with those events.
Upon concluding that, under Delaware law, the right of the plaintiffs, Kevin Askari and Sina Drug Corp. (hereinafter Sina), as sellers, to transactional documents contained in the file of the defendant law firm McDermott, Will & Emery, LLP (hereinafter McDermott), relating to the reorganization, merger, and sale of Sina, was transferred to the new entity/buyer, the defendant Oncomed Specialty, LLC (hereinafter Specialty), post- merger/reorganization, the Supreme Court denied the plaintiffs' motion for summary judgment on the complaint and granted the defendants' separate cross motions for summary judgment dismissing the complaint insofar as asserted against each of them. We reverse the order appealed from for the reasons set forth herein.
I. Background
A. Reorganization of Sina and Creation of Specialty
Askari and nonparty Burt Zweigenhaft were the sole shareholders of Sina, a corporation formed under the laws of the State of New York in October 2001. Sina provided pharmacy and clinical services to cancer patients pursuant to prescriptions which were required for the administration of chemotherapy and the side-effect pharmaceutical management of cancer patients. Sina did business as "Oncomed." Askari was Sina's president as well as its controlling shareholder. Zweigenhaft was Sina's chief executive officer and secretary. The legal services of [*2]McDermott were used during the restructuring of certain corporations, including Sina, the subsequent sale of a percentage of shares of those restructured corporations to an unrelated corporate entity, and all related transactions with respect to those events.
1. McDermott's Engagement Letter Regarding a Potential Asset Sale to Nonparty PharMerica Corporation
By letter dated January 30, 2013, Robert H. Cohen, a senior partner at McDermott, wrote to Zweigenhaft, Askari, and "Onco360," an entity which was not in existence as of that date, to memorialize that McDermott had been engaged to represent "Onco360 and its affiliated entities in connection with the sale of all or substantially all of its assets to PharMerica Corporation" (hereinafter the engagement letter). Cohen, while a member of another firm, had previously represented Askari and Sina in an unrelated action concerning the ownership of shares of Sina and also with respect to a potential sale of Sina to Medco, which never came to fruition.
In the engagement letter, Cohen stated that he, along with another member of the firm, would "be principally responsible for services provided to you" with respect to the sale involving PharMerica Corporation (hereinafter PharMerica). Cohen wrote that:
"In order to avoid misunderstandings concerning potential conflicts of interest, it is our policy to clarify the identity of our clients and the circumstances under which we may represent other clients with interests which are or may be adverse to yours. In that regard, it is our policy that our representation does not extend to the employees, officers, directors, shareholders, partners or other affiliates of Onco360."
Included with the engagement letter was a document entitled "What Clients Should Know." This separate document stated, inter alia, "if you are a corporation, our representation does not include any of your parents, subsidiaries, employees, officers, directors, shareholders, or partners, or any entities in which you own an interest."
2. Plan of Business Reorganization
Subsequently, on October 8, 2013, McDermott reorganized Sina and two related corporations owned by Askari and Zweigenhaft, Oncomed Pharmaceutical Services of Jersey City, New Jersey, Inc. (hereinafter Oncomed NJ), and Oncomed Pharmaceutical Services of MA, Inc. (hereinafter Oncomed MA; hereinafter collectively with Sina and Oncomed NJ, the operating companies), and transferred the ownership of Sina, Oncomed NJ, and Oncomed MA from Askari and Zweigenhaft to Specialty, a limited liability company formed under the laws of Delaware. To do so, McDermott created a "Plan of Business Reorganization" (hereinafter the reorganization plan), which went into effect as of December 3, 2013. Pursuant to the reorganization plan, Askari and Zweigenhaft contributed all of their shares of stock in Sina to Onco360 Holdings 1, Inc. (hereinafter Holdings 1), a subchapter S corporation organized under the laws of Delaware, which owned all of the equity interests in a New York corporation named Onco360 Merger Sub NY, LLC (hereinafter NY Merger LLC). Once the shares had been transferred, Holdings 1 converted Sina into a subchapter S subsidiary and then merged Sina "with and into" NY Merger LLC. The reorganization plan provided that upon the merger, "the separate legal existence of Sina shall cease, and NY Merger LLC shall continue as the surviving company." Finally, Holdings 1 transferred its ownership of NY Merger LLC to Specialty.
Similarly, Askari and Zweigenhaft contributed all of their shares of stock in Oncomed NJ to Onco360 Holdings 2, Inc. (hereinafter Holdings 2), and all of their shares of stock in Oncomed MA to Onco360 Holdings 3, Inc. (hereinafter Holdings 3; hereinafter collectively with Holdings 1 and Holdings 2, the holding entities). Oncomed NJ and Oncomed MA were then converted into subchapter S subsidiaries, and Holdings 2 and Holdings 3 transferred their ownership of those companies to Specialty.
Section 12 of the reorganization plan provided that it "shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Delaware." Askari signed the reorganization plan solely as an individual, while Zweigenhaft signed it on his own behalf and, as chief executive officer and secretary, on behalf of the operating [*3]companies, the holdings entities, and Specialty.
According to the New York State Division of Corporations record pertaining to Sina, Sina "merged out" and became inactive as of December 5, 2013.
3. Membership Interest Purchase Agreement
Along with the reorganization plan for Sina and its related corporations, McDermott prepared a "Membership Interest Purchase Agreement" (hereinafter the MIPA) for the sale of 37.5% of Specialty's membership interests. The parties to the MIPA were (1) Pharmacy Corporation of America, a California corporation, which the MIPA referred to as the "Buyer,"[FN1] (2) Specialty, (3) Askari and Zweigenhaft, who were referred to together as the "Selling Shareholders," (4) the holding entities, which were collectively referred to as the "Sellers," (5) the operating companies, and (6) Askari, who was referred to separately as "Sellers' Representative." As of October 10, 2013, the date the MIPA was executed, Askari and Zweigenhaft owned the operating companies and the holding entities.
Pursuant to article XII of the MIPA, entitled "Sellers' Representative," Askari was "designated as the agent and attorney-in-fact of each of the Selling Shareholders, the [holding entities], [Specialty] (solely with respect to pre-Closing matters) and the [o]perating [c]ompanies (solely with respect to pre-Closing matters)." Article XII also provided that Askari had "exclusive authority to make all decisions and determinations and to take all actions (including giving consents and waivers to this Agreement) required or permitted hereunder on behalf of the Selling Shareholders, the [holding entities], [Specialty] (solely with respect to pre-Closing matters) and the [o]perating [c]ompanies (solely with respect to pre-Closing matters)." This article specified that Askari would act as the sellers' representative with respect to, inter alia, "the investigation, prosecution, defense and/or settlement of any claims pursuant to Article XI of [the MIPA], or otherwise related to [the MIPA] or the transactions contemplated hereby."
Article XI of the MIPA was titled "Indemnification," and set forth which representations and warranties in the MIPA survived the closing. Section 11.2(a) set forth the situations in which Askari and Zweigenhaft, as the selling shareholders, and the holding entities had agreed to indemnify Pharmacy Corporation of America and its affiliates, and section 11.2(b) set forth the situations in which Pharmacy Corporation of America was to indemnify them in return. Specifically, pursuant to section 11.2(a), after the closing the selling shareholders and sellers were to jointly and severally indemnify and hold harmless Pharmacy Corporation of America and its affiliates from losses incurred by them arising, inter alia, from any breach of representation or warranty contained in or made pursuant to the MIPA by Askari and Zweigenhaft, the holding entities, Specialty, or the operating companies, from any nonfulfillment or breach by those parties of any covenant contained in the MIPA, or from a subpoena duces tecum, dated June 24, 2013, served upon Sina by the United States Department of Justice.
Section 13.12 provided that the MIPA "and any disputes hereunder shall be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware."
4. Amended and Restated Operating Agreement
On the same date that the MIPA was executed, an amended and restated operating agreement for Specialty (hereinafter the operating agreement) was executed by Zweigenhaft, on behalf of Specialty, and separately on behalf of the holding entities, which were referred to in the operating agreement as Specialty's "Members," and also as "Sina Members." Thomas A. Caneris, as vice president, signed on behalf of the remaining "Member," Pharmacy Corporation of America. McDermott also prepared this document.
The operating agreement specified that "the PharMerica Member and Sina Members will participate in the ownership and operating of [Specialty] in accordance with the terms of [the [*4]operating agreement]." Exhibit A to the operating agreement noted that Pharmacy Corporation of America owned 37.5% of membership interests, Holdings I owned 50%, and the remaining two Members, Holdings 2 and Holdings 3, each owned 6.25%.
As per article XIII, subsection 13.3, the operating agreement and the rights of the parties pursuant to it were to be "governed by and interpreted in accordance with the laws of the State of Delaware." Moreover, subsection 13.15, entitled "Conflict and Waiver," provided, in part:
"Each Member acknowledges that [Specialty] has retained [McDermott] to act as counsel in connection with the formation and organization of, and the offering of interests in [Specialty] and may engage Holland & Knight LLP ( H & K') in connection with [Specialty's] ongoing legal needs following the date of this Agreement. Each Member and [Specialty] hereby agrees that, in the event that an action or proceeding arises after the date of this Agreement between the Members (or [Specialty]), (a) [McDermott] (or its successors) may represent the Sina Members (or [their] Affiliates) in such dispute even though the interests of the Sina Members (or such Affiliate) may be directly adverse to the PharMerica Member, [Specialty] or [Specialty's] Subsidiaries, and even though [McDermott] may have represented [Speciality] or one of [Speciality's] Subsidiaries in a matter substantially related to such action or proceeding or may be handling ongoing matters for [Specialty] or such Subsidiary. . . . Solely for purposes of such action or proceeding, each of the Members and [Speciality] hereby consents to such representation, and waives any conflict of interest arising therefrom, and each such Member and [Speciality] shall cause any of its respective Affiliates to consent to waive any conflict of interest arising from such representation."
5. Promissory Notes
Zweigenhaft, on his own behalf, executed two promissory notes, both dated October 10, 2013, in favor of Askari. One note was in the amount of $916,116 and the other was in the amount of $1,500,000. The notes specified that they were to be governed by the laws of New York. Both notes were to be paid out of the proceeds of the sale of Zweigenhaft's Specialty shares. The notes were prepared by McDermott.
6. Employment Agreement
PharMerica's counsel, Holland & Knight LLP (hereinafter Holland & Knight), prepared an employment agreement, dated December 6, 2013, between Askari and Specialty whereby Specialty agreed to employ Askari as its vice chairman and chief clinical officer. McDermott and Askari's wife's cousin Raymond Iryami, who was also an attorney, then made comments on this agreement before it was executed. The employment agreement noted that Askari had been a shareholder and employee of Sina and was an owner of Specialty.
Section 11(a) of the employment agreement, which pertained to "Miscellaneous" items, stated, inter alia, that it "shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to principles of conflict of laws." This employment agreement superseded a preexisting employment agreement between Sina and Askari, dated January 1, 2008. Caneris, as Specialty's vice president and secretary, executed the employment agreement on behalf of Specialty, and Askari executed it on his own behalf.
7. McDermott Opinion Letter
McDermott prepared an opinion letter, dated December 6, 2013, in compliance with the terms of the MIPA with respect to the sale of 37.5% of Specialty's membership interests. At the outset of the letter, McDermott identified itself as having acted as counsel to Specialty, the holding entities, the operating companies, Oncomed the Oncology Pharmacy of Philadelphia PA LLC,[FN2] Oncomed Pharmaceutical Services of Buffalo, N.Y. LLC,[FN3] and Askari, in his capacity as the sellers' representative.
B. The Plaintiffs' Request for McDermott's Files
Subsequent to the closing of the subject transactions, Askari requested from McDermott a copy of all of McDermott's files "concerning the restructuring transaction, the transfer of ownership interests and control of Sina and [his] employment agreement." In an email, sent on July 1, 2015, a representative of McDermott refused, stating that the disclosure of the files related to the reorganization of the operating companies and the subsequent sale to Pharmacy Corporation of America was governed by Delaware law so that the attorney-client privilege of the " seller' company," Sina, now belonged to Specialty as the " buyer' company." The representative explained that McDermott was amenable to asking Specialty for permission to release the files, and, upon Specialty authorizing such release, McDermott would provide the files to the plaintiffs' attorney.
On July 10, 2015, the plaintiffs' attorney sent an email to McDermott's representative explaining that it was the plaintiffs' position that New York law controlled the issue of who or which entity held the right to invoke the attorney-client privilege with respect to the subject files. The plaintiffs' attorney reasoned that, based upon the relevant New York case law, Askari and Sina retained ownership of the attorney-client privilege with respect to the reorganization and sale to Pharmacy Corporation of America.
In response, on July 14, 2015, McDermott's representative wrote that, under either Delaware or New York law, Askari was not entitled to obtain the subject files on behalf of Sina, Specialty's predecessor, since Askari had "retired" from Specialty and was working with a new company, Alegria Specialty Pharmacy.
By letter dated August 10, 2015, the plaintiffs' attorney wrote to McDermott reiterating the plaintiffs' position that, under New York conflict of law principles, New York law controlled, regardless of the choice-of-law provisions set forth in the agreements, and detailed New York's substantial nexus with the matters at issue. The plaintiffs' attorney cited to Tekni-Plex, Inc. v Meyner & Landis (89 NY2d 123) as support.
C. Pleadings
In October 2015, the plaintiffs commenced this action for replevin, asserting that they were entitled to possession of McDermott's files related to the transactions between them and Specialty, and directing that McDermott transfer those files to them. The plaintiffs also sought money damages.
In their complaint, the plaintiffs alleged that, throughout 2013 and into 2014, McDermott represented the plaintiffs in contract negotiations concerning the restructuring of Sina and its related entities, the transfer by Askari of part of his ownership interest and control of Sina, and the post-restructuring employment agreement between Askari and Specialty. The plaintiffs averred that, upon their request for a copy of McDermott's files concerning the subject transactions, McDermott refused to deliver the files to them, reasoning that only Specialty was entitled to control the release of the files and that Specialty had refused to consent to the release of the files to the plaintiffs. The plaintiffs further averred that they were entitled to immediate possession of McDermott's files and that McDermott had wrongfully detained the files by refusing to deliver same. The plaintiffs alleged that the files held great value for them and that the failure to deliver the files would cause them to sustain irrevocable harm and unspecified monetary damages.
In its answer, McDermott denied the material allegations of the complaint. McDermott admitted that it had refused to give a copy of its files to Askari without the consent of its "former client," Sina, "and/or pending a determination of whether . . . Askari [was] entitled to a copy of the files." McDermott noted that it had "taken the position that its former client ([Sina]) is now the entity known as [Specialty] and that all privileges, including the right to transaction files, are held by [Specialty]." McDermott noted that Specialty had not given it permission to provide Askari with a copy of the requested files.
In its separate answer, Specialty denied the material allegations of the complaint and interposed various affirmative defenses which are not relevant to this appeal. Specialty admitted that it is a limited liability company formed under the laws of Delaware which conducts business in New York through its subsidiaries, Sina Drug LLC and Oncomed the Oncology Pharmacy of Buffalo N.Y. LLC, which were both New York domestic limited liability companies.
D. Motion Practice
1. The Plaintiffs' Motion for Summary Judgment on the Complaint
In February 2016, the plaintiffs moved for summary judgment on the complaint. In [*5]support of their motion, they submitted an affidavit from Askari as well as, inter alia, the engagement letter with enclosure, the employment agreement, the MIPA, the list of closing documents related to the MIPA which had been prepared by McDermott, McDermott's opinion letter, and the promissory notes.
The plaintiffs argued that Askari was entitled to the McDermott files on the basis that McDermott represented both Sina and Askari, as an individual, with respect to, inter alia, the restructuring of Sina and its related corporations, the transfer of shares from Askari and Zweigenhaft, and the drafting of Askari's employment agreement with Specialty and the promissory notes from Zweigenhaft in favor of Askari. The plaintiffs contended that representation of Askari as an individual by McDermott was apparent given McDermott's representation of Askari in prior matters involving Sina/Specialty, and that McDermott's prior representation of Askari was the reason that Askari engaged McDermott with respect to the subject transactions. Further, in his affidavit, Askari stated that it was his expectation that McDermott was representing his individual interests in these transactions involving Sina given that Sina was a two shareholder corporation.
The plaintiffs asserted that, regardless of whether McDermott represented Askari as an individual or as the former controlling shareholder, president, and director of Sina, they would be entitled to the requested files concerning Sina and its related entities. They noted that, according to the engagement letter, addressed to Askari and Zweigenhaft, as individuals, and to the then-nonexistent Onco360, McDermott represented "Onco360 and its affiliated companies" with respect to the Pharmacy Corporation of America sale, despite language within the same letter stating to the contrary. They also pointed out that, in McDermott's opinion letter, McDermott similarly acknowledged that it did not represent only Specialty with respect to the subject transactions.
The plaintiffs also maintained that if the defendants asserted that Askari was represented by Iryami during the subject transactions, such assertion was without merit. Askari stated in his affidavit that Iryami's area of practice was not in mergers and acquisitions and that Iryami had limited experience in that field. The plaintiffs contended that Iryami's role was limited to reviewing the legal services provided by McDermott.
The plaintiffs maintained that New York law applied in this instance. They asserted that, pursuant to New York law, in a dispute arising from a merger transaction, the rights of the acquired corporation, such as Sina, relating to the transaction would remain independent from those rights acquired by Specialty through the reorganization.
Further, the plaintiffs asserted that the employment agreement, by its terms, was governed by New York law. The plaintiffs also contended that it was clear that the engagement letter, and the relationship between the plaintiffs and McDermott stemming from that letter, was governed by New York law. The plaintiffs argued that between New York and Delaware, New York had the greater interest in the litigation. They also claimed that Askari would be entitled to the files pursuant to Delaware law given the facts that Sina was a closely held corporation and Askari was actively involved in the subject transactions.
Moreover, the plaintiffs contended that this replevin action was an appropriate proceeding by which to seek their former attorney's files.
2. Specialty's Opposition/Cross Motion for Summary Judgment
Specialty opposed the plaintiffs' motion and cross-moved for summary judgment dismissing the complaint insofar as asserted against it. Specialty maintained that Delaware law applied to the issue of attorney-client privilege since the MIPA was the source of the disagreement between the plaintiffs and Specialty, and the MIPA expressly provided that Delaware law applied to any disagreements which arose from it.
Specialty contended that, as the acquiring entity, it obtained all of Sina's assets, which included Sina's legal privileges. As a result, it argued that Askari, as a former controlling shareholder, could not supplant his wishes for those of the current management with respect to Specialty's assets. Specialty maintained that the transfer of assets which occurred between Sina and Specialty included the right to assert the attorney-client privilege since Specialty took control of and continued to operate Sina's business.
Specialty argued that Askari, as an individual, retained his own counsel, Iryami, during the course of the subject transactions, which demonstrated that McDermott did not represent Askari. Further, Specialty pointed out that McDermott's opinion letter noted that the firm represented Askari only in his capacity as a seller's representative. Specialty also asserted that the [*6]documentation submitted by the plaintiffs in support of their motion contradicted the assertions made by Askari in his affidavit.
3. McDermott's Opposition/Cross Motion for Summary Judgment
In its opposition to the plaintiffs' motion and in support of its separate cross motion for summary judgment dismissing the complaint insofar as asserted against it, McDermott argued that it only represented the corporate entities involved in the transaction, and, upon closing, Specialty, as the successor entity, was the only entity entitled to exercise the privileges of Sina, including the attorney-client privilege. In support of its cross motion, McDermott submitted, inter alia, the reorganization plan, the operating agreement, and an excerpt from Alegria Specialty Pharmacy's website.
McDermott noted that Askari was not a member of Specialty's Board of Managers, which had the power to manage the affairs of Specialty, or even a Specialty employee. McDermott maintained that, during the subject transactions, Iryami represented Askari as an individual and that McDermott represented Askari solely in his capacity as the representative of the holding entities as the sellers. McDermott maintained that it addressed the engagement letter to Zweigenhaft and Askari as the officers of what would become the holding entities.
Similar to Specialty, McDermott contended that Delaware law applied to the plaintiffs' request for its files given the language of the MIPA and that, pursuant to Delaware law, the successor entity retained the privileges of the predecessor entities. McDermott maintained that since Specialty's current Board of Managers decided not to waive Specialty's attorney-client privilege with regard to McDermott's files, the files could not be disclosed to Askari. Further, McDermott asserted that Sina no longer existed.
4. The Plaintiffs' Opposition to the Cross Motions and Reply to the Defendants' Opposition to their Motion
In opposition to the cross motions and in further support of their motion, the plaintiffs pointed to the fact that none of the holding entities existed at the time that the engagement letter was issued, and were not created until eight months later [FN4]. Further, they noted that the engagement letter was addressed solely to Askari and Zweigenhaft as individuals.
Even though Iryami did represent Askari, the plaintiffs contended that Iryami's representation did not demonstrate that McDermott's representation of Askari was anything but primary. The plaintiffs submitted an affidavit from Iryami in which Iryami stated that, while he did offer advice and legal services to Askari concerning the Pharmacy Corporation of America transaction, Askari always told Iryami that Askari was primarily represented by McDermott. Iryami stated that he did not prepare any of the documents that formed the basis of the subject transactions. He noted that PharMerica's counsel, Holland & Knight, drafted the employment agreement, which was then commented on by McDermott and by him. He also stated that "[a]lmost all communications by attorneys were between McDermott and Holland & Knight." Iryami described his role with respect to these transactions as acting as a " second set of eyes and ears'" for Askari and "offering . . . comments and suggestions" to Askari and McDermott.
The plaintiffs maintained that, in addition to the employment agreement, McDermott and Specialty also ignored McDermott's role in drafting and negotiating the promissory notes on behalf of Askari. They also pointed out that none of the McDermott attorneys involved in the subject transactions submitted affidavits denying that they provided personal, individual representation to Askari separate and apart from their corporate representative role.
The plaintiffs also noted that the defendants failed to address the plaintiffs' arguments that the choice-of-law provision in the MIPA and reorganization plan were inapplicable to the extent that Delaware law violated New York public policy, that, in any event, the engagement of McDermott necessarily would have been governed by New York law, and that the employment agreement explicitly stated that it was governed by New York law.
E. The Order Appealed From
By order entered May 3, 2016, the Supreme Court denied the plaintiffs' motion for summary judgment on the complaint and granted the defendants' separate cross motions for summary judgment dismissing the complaint insofar as asserted against each of them. The court determined that "pursuant to the [MIPA]'s forum selection clause," Delaware law applied in analyzing the issue of who or which entity was entitled to the privileged documents held by McDermott. The court found that:
"(1) the documentary evidence establishes that [McDermott] only represented Askari in his capacity as agent for a corporate entity, not personally; (2) Iryami represented Askari personally in the Transaction; (3) under Delaware law, the attorney-client privilege passed to [Specialty] upon its acquisition of Sina's assets and its continued operation of Sina's business; and (4) as the current management of [Specialty] does not wish to waive the company's attorney-client privilege as to Askari, [McDermott] may not disclose [Specialty's] privileged communications held by [McDermott] to Askari."
The plaintiffs appeal. We reverse.
II. The Parties' Contentions on Appeal
A. The Plaintiffs' Contentions
The plaintiffs contend that New York law governs this replevin action. They assert that, pursuant to New York law, in a merger transaction, the new company, such as Specialty, cannot pursue rights as the buyer and also assume the privilege retained by the adversaries to the buyer, Askari and Sina, since privileged communications arising from Askari's and Sina's attorney-client relationship with McDermott concerning merger negotiations do not pass to the new or surviving corporation. The plaintiffs assert that the relevant case law holds that only the communications between the prior corporate entity and its then-counsel relating to the business operations of the prior corporate entity transfer to the new management as part of the merger and are subject to the attorney-client privilege now held by the newly formed or acquiring entity. Communications relating to the actual merger do not transfer to the new management.
The plaintiffs note that the MIPA provided that the "selling Shareholders and Sellers," which included Askari and Sina, were to provide indemnification with respect to any breach of any representation, warranty, covenant, or agreement by them or the operating companies and with respect to a pre-merger subpoena served upon Sina by the United States Department of Justice. The plaintiffs point out that the purpose for requesting McDermott's file was to investigate the possibility of commencing a legal malpractice action against McDermott with respect to the entire restructuring transaction and the employment agreement and with respect to a potential fraud claim against Specialty. The plaintiffs contend that the employment agreement and promissory notes were negotiated and prepared by McDermott on behalf of Askari as an individual, and that the employment agreement was intertwined with the merger transaction and related documents.
The plaintiffs assert that, while the employment agreement is expressly governed by New York law, any references to Delaware law in the merger documents should have been disregarded to the extent that such law conflicts with that of New York. The plaintiffs maintain that New York has the greater interest in issues related to the attorney-client privilege and potential legal malpractice claims by a New York attorney with respect to services provided in New York.
The plaintiffs further contend that since Askari—both as an individual and as shareholder, president, and director of closely-held Sina—and Sina were McDermott's clients, they shared the attorney-client privilege with respect to their communications with McDermott and the Supreme Court erred in not releasing the files to them. The plaintiffs claim that the fact that McDermott may have represented other entities did not negate McDermott's representation of them and, in particular, of Askari as an individual.
Further, the plaintiffs argue that, applying Delaware law, the files also must be released to them since Askari, as Sina's majority shareholder, director, and president, was actively involved in the merger transaction. They contend that, regardless of whether Sina is still in existence, Askari, individually, has a right, pursuant to Delaware law, to review the materials prepared by McDermott while he was in charge of Sina.
The plaintiffs maintain that they submitted evidence, through Askari's affidavit, that [*7]McDermott represented Askari as an individual, as well as Sina, with respect to Sina's restructuring, the execution of the MIPA, the employment agreement, and the promissory notes, while the defendants failed to submit any affidavits from individuals with personal knowledge of the underlying facts.
The plaintiffs assert that while the engagement letter, upon which the defendants relied in their separate cross motions and opposition to the plaintiffs' motion for summary judgment on the complaint, stated that McDermott did not represent the plaintiffs, the letter contained contradictory language as to the identity of McDermott's clients. Further, the plaintiffs note that the engagement letter was addressed to Askari and Zweigenhaft, individually, in addition to an entity, Onco360, which did not exist as of the date of the letter. They also note that the engagement letter did not state that Askari was a client only to the extent that he was acting as a representative for the sellers, and, in any event, such language would not have had any significance to Askari, who is not a lawyer. Thus, they argue that Askari considered McDermott his primary counsel while Iryami's services were used solely to review and provide input with respect to the work performed by McDermott.
B. Specialty's Contentions
Specialty argues that the Supreme Court properly denied the plaintiffs' motion for summary judgment on the complaint and granted the defendants' separate cross motions for summary judgment dismissing the complaint insofar as asserted against each of them. Specialty maintains that there is no evidence that Askari is entitled to McDermott's files relating to the subject transaction because McDermott never represented Askari personally and Sina no longer exists. Specialty maintains that, under applicable Delaware law, and even under New York law, the attorney-client privilege related to those files belongs to Specialty.
Specialty contends that the MIPA is clear that Delaware law is to be applied with respect to any dispute arising from it. Specialty asserts that the contention that the governing law of McDermott's engagement letter or of the employment agreement is controlling is not supported by documentary evidence.
Moreover, Specialty argues that, even if New York has a greater interest in this litigation than Delaware, Delaware law should apply since there is a reasonable basis for that choice-of-law in the MIPA and no fundamental policies of New York law will be violated by the application of Delaware law. Specialty contends that, although McDermott is not a party to the MIPA, this controversy arises from the MIPA, and Specialty itself is a Delaware limited liability company. Thus, Specialty contends that there was a reasonable basis for the Supreme Court to apply Delaware law. Specialty asserts that the plaintiffs' contention that this controversy is primarily between McDermott and the plaintiffs is an attempt to circumvent Specialty's privilege with regard to the requested documents.
Specialty argues that a conflict with a fundamental public policy of New York typically is found to exist where the conflict involves a law establishing a civil right. Specialty contends that the difference between the law of Delaware and that of New York concerning the privilege issue does not rise to that level.
Specialty asserts that the plaintiffs' use of "an interest analysis approach" to show that New York law should be applied is misguided, since the MIPA specified that Delaware law is to be used. Specialty argues that the plaintiffs' contention that the privilege issue should instead be governed by the law which applies to the attorney-client relationship between Askari and McDermott is without merit since the documentary evidence demonstrated that Askari, as an individual, was not represented by McDermott.
Specialty concludes that, following the reorganization, all of Sina's rights and business operations transferred to it pursuant to Delaware law. Applying the rationale of the Delaware Court of Chancery, set forth in Great Hill Equity Partners IV, LP v SIG Growth Equity Fund I, LLLP (80 A3d 155 [Del Ch]), to the case at bar, Specialty argues that the plaintiffs surrendered their rights to the files at the closing of the transaction, when Sina, along with the other absorbed entities, ceased to exist and became Specialty. Specialty maintains that, as a result, only it has the right to enforce the attorney-client privilege which Sina used to hold.
Specialty challenges the plaintiffs' assertion that, even if this Court were to apply Delaware General Corporation Law (hereinafter DGCL) § 259(a) and the holding in Great Hill, they would still be entitled to the subject files on the basis of an exception to the general rule that a [*8]director's right to inspect corporate books terminates upon removal from office when those books are necessary to support potential legal claims. Specialty maintains that this exception only allows a former director the qualified right to inspect corporate documents to protect personal responsibility interests, which is a much narrower interpretation than the plaintiffs have suggested. Specialty asserts that the purpose of the exception is to allow former directors who were not adverse to the corporation to access documents necessary to support a defense premised upon advice of counsel. As such, Askari, who was in an adverse position to Specialty at the time of the transaction, retained separate counsel, and has conceded that the purpose of obtaining the files is to investigate the feasibility of a legal malpractice action against McDermott and a possible claim against Specialty, cannot rely on the exception. Specialty claims that the negotiation of the promissory notes and employment agreement also shows the adverse nature of Askari's position in relation to Specialty. Further, Specialty notes that there was no litigation pending against Askari for which he would need McDermott's files in order to prepare a defense.
Moreover, Specialty contends that, even if the contractual choice of Delaware law is not applied and New York law with respect to the attorney-client privilege is applied, the plaintiffs would still not be entitled to the McDermott files. Specialty maintains that, in general, when a change in management occurs due to a merger, the attorney-client privilege with respect to all communications, including those by former directors, is assumed by the new management. Speciality argues that Tekni-Plex, Inc. v Meyner & Landis (89 NY2d 123), upon which the plaintiffs rely, is a departure from this rule and should not be applied here.
Specialty also contends that the facts establish that McDermott did not represent Askari individually in the transaction, regardless of which law is applied. Specialty notes that Askari commenced a separate action against Iryami to recover damages for legal malpractice with respect to Iryami's representation during the subject transaction. Consequently, Specialty maintains that Askari is not entitled to the McDermott files.
C. McDermott's Contentions
McDermott maintains that, under Delaware law, which applies here pursuant to the terms of the MIPA, all privileges and files of Sina and its related corporations transferred to Specialty as a result of the merger. McDermott asserts that it represented only the corporate entities involved in the transaction, so that any privilege belonged to those corporate entities and then transferred to Specialty, as the successor entity. McDermott notes that Specialty is operated by a Board of Managers, of which Askari is not a member, and that Specialty's Board of Managers elected not to waive the privilege to McDermott's files.
Further, McDermott argues that the plaintiffs' contention that Askari is entitled to the subject files since it represented Askari in his individual capacity is belied by the documents upon which the plaintiffs relied in support of their motion. McDermott maintains that it was retained by "Onco360," and that Zweigenhaft and Askari each had their own attorneys representing them as individuals. McDermott claims that the plaintiffs' assertion that Iryami did not represent Askari as an individual since Iryami lacked experience in corporate law is contradicted by Iryami's website, which states that Iryami represents clients in all phases of business development. McDermott notes that the MIPA provided that Iryami was to receive copies of all notices sent to Askari individually. McDermott also points out that Askari commenced a replevin action against Iryami alleging, inter alia, that Iryami represented Askari in the subject merger with Specialty.
D. The Plaintiffs' Reply
In reply, the plaintiffs note that the complaint served in the replevin action against Iryami alleges that Askari was represented by Iryami, "along with other attorneys." They also note that the complaint in that action also sought files from Iryami which concerned other transactions which occurred in 2015. Moreover, the plaintiffs note that the only affidavits that were submitted on their motion and the defendants' respective cross motions supported the plaintiffs' position that McDermott represented both of them, since no affidavits were submitted other than the affidavits from Askari and Iryami.
The plaintiffs argue that, even in the event that this Court does not find, as a matter of law, that Askari, as an individual, was represented by McDermott, the order should still be reversed insofar as it granted the defendants' separate cross motions. They claim that, in that instance, discovery should be conducted on the issue of whether Askari, as an individual, was [*9]represented by McDermott.
Further, the plaintiffs maintain that Specialty's position that Askari's interests were adverse to Sina during the course of negotiations is without merit. The plaintiffs contend that Askari's position was never adverse to Sina. In addition, they point out that the promissory notes, which McDermott maintains show that Askari was in an adverse position to Sina, were between Askari and Zweigenhaft and not Askari and Specialty. However, the plaintiffs maintain that it is clear that Specialty is adverse to Askari so that Specialty is not entitled to both defend and pursue certain rights while assuming the plaintiffs' right to the attorney-client privilege.
IV. Analysis
A. Choice of Law
"[I]t is a deeply rooted' principle of New York contract law that parties may . . . contract as they wish'" (2138747 Ontario, Inc. v Samsung C & T Corp., 31 NY3d 372, 377, quoting J.P. Morgan Sec. Inc. v Vigilant Ins. Co., 21 NY3d 324, 334). "[C]ourts will generally enforce choice-of-law clauses and . . . contracts should be interpreted so as to effectuate the parties' intent" (Ministers & Missionaries Benefit Bd. v Snow, 26 NY3d 466, 470; see 2138747 Ontario, Inc. v Samsung C & T Corp., 31 NY3d at 377). The primary purpose of utilizing choice-of-law provisions in contracts is "to avoid a conflict-of-laws analysis and its associated time and expense" (Ministers & Missionaries Benefit Bd. v Snow, 26 NY3d at 475).
However, "[t]he freedom to contract . . . has limits" (Welsbach Elec. Corp. v MasTec N. Am., Inc., 7 NY3d 624, 629). Choice-of-law clauses will be enforced "so long as the chosen law bears a reasonable relationship to the parties or the transaction" (id. at 629). Courts will not enforce agreements "where the chosen law violates some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal'" (id., quoting Cooney v Osgood Mach., 81 NY2d 66, 78).
"This public policy exception is reserved for those foreign laws that are truly obnoxious'" (Brown & Brown, Inc. v Johnson, 25 NY3d 364, 368, quoting Cooney v Osgood Mach., 81 NY2d at 79; see Welsbach Elec. Corp. v MasTec N. Am., Inc., 7 NY3d at 629). "The party seeking to invoke the exception bears a heavy burden of proving that application of [the chosen] law would be offensive to a fundamental public policy of this State'" (Brown & Brown, Inc. v Johnson, 25 NY3d at 369, quoting Welsbach Elec. Corp. v MasTec N. Am., Inc., 7 NY3d at 632 [internal quotation marks omitted]; see Cooney v Osgood Mach., 81 NY2d at 80; Matter of Frankel v Citicorp Ins. Servs., Inc., 80 AD3d 280, 286).
B. Privileged Communications
"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law" (Upjohn Co. v United States, 449 US 383, 389; see Spectrum Sys. Intl. Corp. v Chemical Bank, 78 NY2d 371, 377). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice" (Upjohn Co. v United States, 449 US at 389; see Spectrum Sys. Intl. Corp. v Chemical Bank, 78 NY2d at 377). "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client" (Upjohn Co. v United States, 449 US at 389).
1. New York Law
Under New York law, the attorney-client privilege regarding pre-merger communications between an attorney and his or her client which are related to a business/corporate merger does not fully pass to the new or surviving company/buyer, but remains with the former shareholders of the prior company/seller (see Tekni-Plex, Inc. v Meyner & Landis, 89 NY2d at 130). In Tekni-Plex, the Court of Appeals determined that the buyer in a corporate acquisition controlled the attorney-client privilege as to some, but not all, of the pre-merger communications (see id. at 127). In that case, Tekni-Plex, Inc. (hereinafter the original Tekni-Plex) was a Delaware corporation which had 18 shareholders and a 5-member board of directors. Tom Y. C. Tang was a director as well as a shareholder (see id.). In 1986, Tang became the sole shareholder, president, chief executive officer, and sole director of the original Tekni-Plex (see id.).
In 1971, the New Jersey law firm of Meyer & Landis (hereinafter the law firm) was [*10]retained by the original Tekni-Plex to represent it with respect to various matters including environmental compliance issues (see id. at 127-128). The law firm also represented Tang individually on several personal matters (see id. at 128).
In 1994, Tang and the original Tekni-Plex entered into an agreement and plan of merger with TP Acquisition Company, whereby Tang sold the company to TP Acquisition Company (see id.). In that transaction, the law firm represented both the original Tekni-Plex and Tang personally (see id.). The original Tekni-Plex merged into TP Acquisition Company, a shell corporation formed solely to acquire the original Tekni-Plex (see id.). TP Acquisition Company was the surviving corporation of the merger, while the original Tekni-Plex ceased its separate existence and conveyed to TP Acquisition Company all of its tangible and intangible assets, rights, and liabilities (see id.). TP Acquisition Company thereafter changed its name to Tekni-Plex, Inc. (hereinafter the new Tekni-Plex) (see id.).
Thereafter, the new Tekni-Plex commenced an arbitration proceeding against Tang, alleging breach of the representations and warranties contained in the merger agreement regarding compliance with environmental laws (see id.). Tang retained the law firm to represent him in the arbitration (see id.). The new Tekni-Plex moved, inter alia, to enjoin the law firm from disclosing to Tang any information obtained from the original Tekni-Plex and to direct the law firm to return to the new Tekni-Plex all of the files in the law firm's possession concerning its prior legal representation of the original Tekni-Plex (see id. at 129).
With respect to disclosure of the law firm's files to the new Tekni-Plex, the Court of Appeals determined that "[a]s for confidential communications between [the original] Tekni-Plex and [the law firm] generated during the law firm's prior representation of the corporation on environmental compliance matters, authority to assert the attorney-client privilege passed to the corporation's successor management" (id. at 130). However, the Court distinguished the communications made during the acquisition:
"New Tekni-Plex, however, does not control the attorney-client privilege with regard to discrete communications made by either [the original] Tekni-Plex or Tang individually to [the law firm] concerning the acquisition—a time when [the original] Tekni-Plex and Tang were joined in an adversarial relationship to Acquisition. Consequently, new Tekni-Plex cannot assert the privilege in order to prevent [the law firm] from disclosing the contents of such communications to Tang. Nor is new Tekni-Plex entitled to the law firm's confidential communications concerning its representation of [the original] Tekni-Plex with regard to the acquisition" (id.).
Thus, the Court of Appeals made a clear distinction between confidential communications regarding a company's ongoing operations and those related to its acquisition (see id. at 136). The Court noted that, during the acquisition negotiation process, the predecessor company and its shareholders were in an adversarial relationship with the successor company (see id. at 138-139). Therefore, the original Tekni-Plex continued to control the attorney-client privilege with respect to confidential communications concerning the acquisition, and was entitled to refuse to disclose such communications to the new Tekni-Plex (see id. at 138-139; Fochetta v Schlackman, 257 AD2d 546, 546 ["Given the extent of plaintiff's ownership interest and managerial involvement in defendant corporations prior to the disputed stock surrender, the motion court properly determined that the attorney-client privilege was not properly invoked by defendants to deny plaintiff access to otherwise privileged pre-surrender materials essential to the proof of his claims"]; see also Orbit One Communications, Inc. v Numerex Corp., 255 FRD 98, 104, 106-107 [SD NY] ["Allowing Numerex to control Old Orbit One's privilege would lead to a fundamentally unfair result. . . . Numerex cannot both pursue the rights of the buyer and simultaneously assume the attorney-client rights of the buyer's adversary, Old Orbit One. Old Orbit One retained ownership of, and continues to control, the attorney-client privilege as to confidential communications with [the law firm which represented it throughout the acquisition negotiations] concerning the acquisition transaction" [citation omitted]).
2. Delaware Law
Delaware General Corporation Law § 259(a), which pertains to "Status, rights, liabilities, of constituent and surviving or resulting corporations following merger or consolidation," [*11]provides, in pertinent part:
"When any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, shall cease and the constituent corporations shall become a new corporation, or be merged into [one] of such corporations, as the case may be, possessing all the rights, privileges, powers and franchises as well of a public as of a private nature, and being subject to all the restrictions, disabilities and duties of each of such corporations so merged or consolidated; and all and singular, the rights, privileges, powers and franchises of each of said corporations, and all property, real, personal and mixed, and all debts due to any of said constituent corporations on whatever account . . . shall be vested in the corporation surviving or resulting from such merger or consolidation; and all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations" (DGCL § 259[a]).
In Great Hill Equity Partners IV, LP v SIG Growth Equity Fund I, LLLP (80 A3d at 156), the Delaware Court of Chancery held that, in the event of a merger, where Delaware law is applied, the attorney-client privilege passes to the surviving corporation pursuant to statute. In that case, where there was a merger in which Plimus, a California corporation, was the surviving corporation, the buyers, Delaware corporations, sued the sellers, the former shareholders and representatives of Plimus, alleging that they were fraudulently induced by the sellers into acquiring Plimus. A year after the merger and while the action was pending, the buyers discovered pre-merger communications between the sellers and Plimus's then-legal counsel regarding the merger transaction on Plimus's computer systems, which the buyers acquired in the merger (see id.). Prior to the merger, the sellers had not taken any steps to remove the communications from Plimus's computer systems and failed, subsequent to the merger and prior to disclosure by the buyers, to retrieve these computer records (see id.). Moreover, the merger agreement between the parties did not contain any provision excluding pre-merger attorney-client communications from the assets of Plimus, which were then transferred to the buyers as part of the merger (see id.). The merger was governed by Delaware law (see id.).
Upon the buyers' disclosure of the documents, the sellers asserted that the documents were protected by the attorney-client privilege because they pertained to the negotiations of the merger agreement (see id.). The buyers argued, inter alia, that Plimus, as the surviving corporation, owned and controlled any pre-merger privilege pursuant to DGCL § 259 (see Great Hill Equity Partners IC, LP v SIG Growth Equity Fund I, LLLP, 80 A3d at 156).
The Delaware Court of Chancery held, in reliance on the statutory language set forth in DGCL § 259, that the rights to the privileged communications between a predecessor corporation and counsel passed to the surviving corporation, including those communications relating to the acquisition of the predecessor corporation by the surviving corporation (see Great Hill Equity Partners IC, LP v SIG Growth Equity Fund I, LLLP, 80 A3d at 157-158). The court found that the sellers' interpretation of the subject statute was not plausible because the sellers' interpretation limited the statute to certain property rights, when the language of the statute "uses the broadest possible terms to make sure that all' assets of any kind belong to the surviving corporation after a merger" (id. at 157). Thus, the court held that, the DGCL "set a clear and unambiguous default rule: all privileges of the constituent corporations pass to the surviving corporation in a merger" (id. at 159).
In Great Hill, the Delaware Court of Chancery noted that the sellers relied on the holding of the Court of Appeals in Tekni-Plex, Inc. v Meyner & Landis for their position that they were entitled to the privileged documents (see id. at 158). The Delaware Court of Chancery stated that, in Tekni-Plex, "the Court of Appeals innovated and, without citing § 259 of the DGCL, concluded that the pre-merger attorney-client communications regarding the merger negotiations did not pass to the surviving corporation for policy reasons related to its analysis of New York attorney-client privilege law" (id.). The Delaware Court of Chancery observed that, by doing so, the Court of Appeals was transferring "all privileges" to the surviving corporation "minus judicially-created [*12]exceptions" (id. at 160 [internal quotation marks omitted]), which the Delaware courts did not have the authority to do since that would "usurp the General Assembly's statutory authority" (id.).
C. Law Applicable to this Dispute
Here, in the complaint, the plaintiffs seek the documents contained in McDermott's file related to the "transaction," which they allege included not only the execution of the MIPA, but also the reorganization of Sina and the employment agreement. While the MIPA provided that it "and any disputes hereunder" would be governed by and construed in accordance with the laws of Delaware, the reorganization plan only provided that "[t]his Plan" would be governed by and construed in accordance with Delaware law. Moreover, the employment agreement stated that it would be governed by New York law. Similarly, the promissory notes, which were executed as part of the reorganization of Sina, stated that they would be governed by New York law. Consequently, the Supreme Court should not have held that the choice-of-law provision set forth in the MIPA governed the plaintiffs' request for copies of McDermott's files concerning the "transaction" as a whole when the transaction concerned multiple stages and documents.
Significantly, the issue at bar does not concern a dispute arising under the MIPA. While some of the documents in McDermott's possession with respect to the MIPA may ultimately be relevant in potential subsequent litigation between the plaintiffs and Specialty concerning a dispute arising under the MIPA, the cause of action here pertains to the plaintiffs' right to the documents in McDermott's possession with respect to its representation of various individuals and/or entities. Consequently, the choice-of-law provision in the MIPA is not even implicated here. The gravamen of the plaintiffs' claim sounds in replevin, not the interpretation or enforcement of the MIPA or any other agreement.
In a situation where documents are sought, New York will apply the law of the forum where the evidence will be introduced at trial or the location of the proceeding seeking discovery of those documents (see People v Greenberg, 50 AD3d 195, 198-199). Here, the privileged communications being sought by the plaintiffs in this New York replevin action were made in New York between New York-based attorneys at McDermott and Sina, a New York corporation, involving its then-majority shareholder and president, Askari, a New York resident. The sole nexus that Delaware has to this action is that Specialty is a limited liability company formed under the laws of that state. Consequently, New York law applies in this action sounding in replevin seeking the disclosure of McDermott's files (see id. at 199).
It would indeed be incongruous to enforce a law which effectively forecloses New York corporations merging with foreign corporations from having the ability to pursue their claims against their counsel or the newly formed, post-merger entities based on the post-merger entities' control of the documents needed by the former entities to prosecute potential claims. Here, Delaware law gives the new corporation, a putative defendant, sole access to and control of the merger-related documents by the exercise of the attorney-client privilege. This is contrary to New York public policy as enunciated in Tekni-Plex.
B. Summary Judgment Motions and Cross Motions
1. Standard of Review
The proponent of a motion for summary judgment carries the initial burden of demonstrating his or her entitlement to judgment as a matter of law by submitting evidence showing the absence of any material issues of fact (see Alvarez v Prospect Hosp., 68 NY2d 320, 324). Once the moving party has made a prima facie showing, the burden shifts to the opposing party to demonstrate, through sufficient evidence in admissible form, the existence of a triable issue of fact (see Zuckerman v City of New York, 49 NY2d 557, 562).
"A cause of action sounding in replevin must establish that the defendant is in possession of certain property of which the plaintiff claims to have a superior right" (Nissan Motor Acceptance Corp. v Scialpi, 94 AD3d 1067, 1068; see Southeast Fin., LLC v Broadway Towing, Inc., 117 AD3d 715, 715; Batsidis v Batsidis, 9 AD3d 342, 343). A cause of action sounding in replevin is an appropriate manner by which to seek the file of a former attorney (see Wiel v Curtis, Mallet-Prevost, Colt & Mosle, 66 Misc 2d 466 [Sup Ct, NY County], affd 36 AD2d 1027, affd 30 NY2d 500).
2. The Plaintiffs' Claim for Replevin
In this case, Sina was merged into NY Merger LLC and NY Merger LLC's shares were contributed to Specialty. The same merger/conversion occurred with respect to Sina's related corporations and their corresponding holding entities. Besides management of the "Company," the business did not change as a result of the merger, and the rights, privileges, liabilities, and obligations of the business passed to Specialty. However, Sina, which continues to "exist" for the purpose of this action (see Business Corporation Law § 1006)[FN5], and Askari, as a former director of Sina, or even in his capacity as "Seller's Representative," had the right to request McDermott's files on behalf of Sina with respect to those documents involving the "transactions," as well as in his own behalf with regard to the employment agreement and promissory notes.
Here, Business Corporation Law § 1006 specifically provides that a dissolved corporation, like Sina, may commence an action in any court under its corporate name. Sina's dissolution does not affect Sina's right or capacity to maintain this replevin action since the claim arose from McDermott's representation of Sina which began before Sina's dissolution. The exceptions listed in Business Corporation Law § 1006 do not apply. Thus, the plaintiffs demonstrated their prima facie entitlement to judgment as a matter of law in this action for replevin since the plaintiffs submitted evidence, through Askari's affidavit, that McDermott represented Sina and Askari during the "transactions." As a result, the plaintiffs demonstrated, prima facie, their superior possessory right to McDermott's files.
In opposition, the defendants failed to raise a triable issue of fact. Their reliance on Delaware law with respect to the attorney-client privilege is unavailing since Delaware law is not applicable here with regard to the plaintiffs' claim, which does not involve the enforcement or interpretation of any agreements pertaining to the merger.
In addition, the fact that Askari utilized the services of more than one attorney during the "transactions" does not demonstrate or raise an issue of fact as to whether Iryami was Askari's sole counsel. While the plaintiffs submitted the affidavit of Askari stating that he was represented by McDermott during the subject transactions, the defendants did not submit evidence to the contrary from any individual with personal knowledge of the facts.
Moreover, the engagement letter similarly does not definitively establish exactly who and which entity or entities McDermott represented given the fact that the entity by the name of Onco360 did not exist at the time that the engagement letter was drafted. The ambiguity as to the identity of McDermott's clients must be construed against McDermott as the drafter of the engagement letter (see Albunio v City of New York, 23 NY3d 65, 71). "The general rule that equivocal contracts will be construed against the drafters' is subject to particularly rigorous enforcement in the context of attorney-client retainer agreements" (id. at 71, quoting Shaw v Manufacturers Hanover Trust Co., 68 NY2d 172, 176). In addition, the engagement letter stated that it pertained to "the sale of all or substantially all of [Onco360's] assets to PharMerica Corporation," as opposed to the restructuring of Sina and eventual merger into Specialty and the transactions related to that event. Further, McDermott's opinion letter, which was subsequently prepared, showed that McDermott represented numerous entities, in addition to "Onco360," during the course of the transactions.
For the same reasons that the plaintiffs are entitled to summary judgment on the complaint, the Supreme Court should have denied the defendants' separate cross motions for summary judgment dismissing the complaint insofar as asserted against each of them.
Accordingly, the order is reversed, on the law and the facts, the plaintiffs' motion for [*13]summary judgment on the complaint is granted, and the defendants' separate cross motions for summary judgment dismissing the complaint insofar as asserted against each of them are denied.
SCHEINKMAN, P.J., BALKIN and HINDS-RADIX, JJ., concur.
ORDERED that the order is reversed, on the law and the facts, with one bill of costs, the plaintiffs' motion for summary judgment on the complaint is granted, and the defendants' separate cross motions for summary judgment dismissing the complaint insofar as asserted against each of them are denied.
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1: According to section 13.8 of the MIPA, notice to the buyer, Pharmacy Corporation of America, was to be sent in care of PharMerica and its counsel.

Footnote 2: Sina held 100 % of the membership interest in this company.

Footnote 3: Sina held 100 % of the membership interest in this company.

Footnote 4: The plaintiffs did acknowledge, however, that Sina had been doing business as Onco360 prior to the issuance of the engagement letter.

Footnote 5: Business Corporation Law § 1006, states, in pertinent part:
"The [dissolved] corporation may sue or be sued in all courts and participate in actions and proceedings . . . in its corporate name. . . . The dissolution of a corporation shall not affect any remedy available to or against such corporation, its directors, officers or shareholders for any right or claim existing or any liability incurred before such dissolution, except as provided in sections 1007 (Notice to creditors; filing or barring claims) or 1008 (Jurisdiction of supreme court to supervise dissolution and liquidation)" (Business Corporation Law § 1006[a][4]; [b]).